The STATE of Ohio, Appellee,

v.

BAILEY, Appellant.

[Cite as *State v. Bailey* (1992), 90 Ohio App.3d 58.]

Court of Appeals of Ohio,
Lake County.

No. 91–L–021.

Decided Aug. 31, 1992.

60

*Steven C. LaTourette*, Lake County Prosecuting Attorney, and *Ariana E. Tarighati*, Assistant Prosecuting Attorney, for appellee.

*John J. Gill*, for appellant.

Christley, Presiding Judge.

This appeal emanates from a judgment of the Lake County Court of Common Pleas. Following a protracted jury trial, defendant-appellant, Michael A. Bailey, was found guilty of two counts of aggravated murder and a firearm specification. This conviction was predicated upon the shooting deaths of appellant's adoptive mother and stepfather.

Approximately three months following his birth in 1967, appellant was adopted by Roger and Carole Bailey. When he was approximately twelve years of age, appellant's adoptive father died from alcoholism. A few years after the death of her first husband, Carole married William Erbeznik. During the course of this marriage, the Erbezniks resided with appellant and a second adopted son at Carole's prior home on Mentorwood Avenue in Mentor, Ohio.

After graduating from high school, appellant served a three-year stint in the army. Upon receiving his discharge, appellant enrolled at Cleveland State University in the fall of 1989. In addition to receiving funds through the G.I. Bill, appellant paid for his education by working part-time at a local restaurant. During this period, appellant again lived with his adoptive mother and his stepfather in their Mentor residence.

On the evening of February 7, 1990, the City of Mentor Police Department received a request for assistance from the Erbeznik residence. Upon arriving at the home, two members of the department were escorted by appellant to a

bedroom in the basement. There, the officers discovered the bodies of the victims. A quick inspection of the bodies showed that the Erbezniks had both died from multiple gunshot wounds.

As part of the ensuing investigation, various officers searched the residence. In inspecting the home's doors and windows, the officers did not find any signs of a forced entry. Moreover, an inspection of the couple's bedroom did not produce any evidence indicating that a struggle had occurred before the shootings. In fact, the sparse evidence in the bedroom supported the inference that the Erbezniks had been shot while they were sleeping.

In searching the kitchen, the officers found a receipt for a .38 caliber Charter Arms revolver. This firearm had been purchased by Carole Erbeznik in 1988. In addition, the officers found on the kitchen table a note from appellant to his adoptive mother, asking her to wake him up at 7:00 in the morning.

After showing the officers the location of the bodies, appellant was initially questioned about the incident in the living room of the residence. Upon denying any involvement in the shootings, appellant stated that his adoptive mother had recently been experiencing emotional problems. He also indicated that since there had been some concern that his mother might attempt to commit suicide, his stepfather had asked him to hide a handgun in his bedroom.

Once appellant had made these statements, the officers searched his bedroom and found the handgun, along with a cartridge box and eleven empty shell casings, in a small crawl space above his closet. This particular handgun was a .38 caliber Smith and Wesson revolver.

Upon giving his initial statement to the police at the residence, appellant agreed to accompany two of the officers to the station. There, appellant was placed in an interview room, where he was questioned for approximately three hours by a detective. At first, appellant again maintained that he had not been involved in the shootings. However, near the conclusion of the questioning, he recanted his previous statements and stated that he had shot his adoptive mother and his stepfather with a .38 caliber gun. He then agreed to provide a written statement on the incident.

In this statement, appellant essentially wrote that on the night of February 6, he had come home at approximately 11:30 p.m. He then went to his bedroom and loaded the gun. After staring at the gun for a certain period, he went down to his parents' bedroom and stared at them for awhile. He then fired the gun a number of times. Following this, he placed the gun in a gym bag and drove to a local restaurant, where he pitched the gun into a dumpster. He then decided to call the police after he had come from school the next day.

Following up on appellant's new statement, two officers from the department attempted to retrieve the gun from the restaurant dumpster the next day. After an initial search, the officers were informed by the manager of the restaurant that the dumpster in question had been emptied the day after appellant had supposedly tossed the murder weapon into it. The officers also learned that the trash collector had then dumped the garbage into a large landfill. As a result, the police were unable to locate the firearm which allegedly had been used in the shootings.

However, an analysis of the bullets found in the wall of the Erbezniks' bedroom supported the conclusion that the Charter Arms revolver had been used in the shootings. While both of the guns owned by the Erbezniks were .38 caliber, the rifling on the bullets was only consistent with that of a bullet fired from a Charter Arms revolver, as compared to a Smith and Wesson. As noted above, the police were only able to find the Smith and Wesson revolver.

An analysis was also performed on the hands of the two victims. The results of this analysis supported the finding that neither victim had gripped a firearm immediately prior to their deaths. In addition, an analysis of the victims' multiple wounds indicated that the shots had not been fired from close range.

The initial indictment against appellant, returned in February 1990, only contained the two counts of aggravated murder. Six months later, the grand jury returned a second indictment. Besides alleging that appellant had purposely, and with prior design and calculation, caused the deaths of his parents, this indictment had a firearm specification under each of the counts. The specification alleged that appellant had had possession of a firearm while committing each offense.

Prior to trial, appellant moved the trial court to suppress the oral and written statements which he had given to the police. As grounds for this motion, appellant argued that he had not voluntarily waived his *Miranda* rights prior to giving the statements, and that his ultimate confession had been coerced. As to the latter ground, he asserted that the detective who questioned him at the station "seduced" him into confessing by promises of psychological assistance and leniency.

Following an evidentiary hearing, at which appellant and the detective both testified, the trial court denied the motion to suppress. Addressing only the first aspect of the motion, the court found that appellant had made a voluntary, knowing and intelligent waiver of his rights. The court also found that appellant had had the opportunity to stop the interrogation and request the presence of an attorney at any time.

Also prior to trial, counsel for appellant moved for a psychological evaluation of appellant. As grounds, counsel averred in an affidavit that appellant was not assisting in preparing a defense, and did not appreciate the nature of the charges. Following a hearing, this motion was likewise denied.

At trial, the trial court granted the state's motion to consolidate the two indictments. However, in instructing the jury at the end of the case, the court referred solely to the second indictment. Once the jury had retired, the state then dismissed the first indictment.

During the course of the trial, appellant attempted to attack the credibility of the written statement which he had given to the detective. Specifically, in denying that he had committed the murders, appellant sought to establish that he had "confessed" because he was susceptible to the type of influence used by the detective in questioning him about the incident. In support of this position, appellant tried to introduce evidence showing that as a child, he had been sexually abused by his adoptive father, Roger Bailey. However, the trial court sustained the state's objection to this testimony.

Once the jury had returned its verdict, the trial court merged the two firearm specifications. The trial court then sentenced appellant to a definite term of three years on the remaining specification, to be followed by two consecutive indefinite terms of twenty years to life on the aggravated murder charges.

In appealing his conviction to this court, appellant has assigned the following as error:

"1. The trial court erred in failing to order a psychiatric examination of Appellant pursuant to the issue of competency being raised under Ohio Revised Code Section 2945.37.

"2. The trial court erred by improperly limiting the defense cross-examination of Detective Daniel Llewellyn.

"3. The trial court erred by improperly limiting the defense on direct examination of appellant.

"4. The trial court erred by improperly limiting the defense on direct examination of Helen Rachael.

"5. The trial court erred in refusing the defense request to instruct the jury on lesser included offenses.

"6. The trial court erred in failing to grant Appellant's motion to suppress his confession from evidence.

"7. The trial court erred in allowing new witnesses and evidence to come in during the course of the trial.

"8. (A) The trial court erred in failing to dismiss one of the two indictments. (B) The trial court erred in overruling Appellant's Motion in Limine regarding the handgun.

"9. (A) The trial court erred in failing to give a curative charge during voir dire after a prospective juror stated her opinion as to Appellant's guilt. (B) The trial court erred in substituting jurors without proper presentment to the court of a seated juror's excused absence.

"10. The trial court erred in imposing additional incarceration for the firearm specification.

"11. The cumulative effect of errors committed by the trial court was prejudicial to Appellant and operated to deprive Appellant of his constitutional rights of due process and to a fair trial."

As noted previously, approximately six days prior to the beginning of the trial, counsel for appellant moved for an order directing that appellant be examined to determine whether he was competent to stand trial. A hearing on this motion was then held four days later. At that time, the trial court interviewed appellant, and then decided that an examination was not needed. Accordingly, the court denied counsel's motion.

 Under his first assignment of error, appellant submits that the trial court failed to hold a full hearing on the competency motion, as required under R.C. 2945.37. Specifically, he maintains that under the statute, the court was required to order a competency examination before holding a hearing on the motion. In essence, appellant contends that a full hearing on the motion could not be held until he had been given a psychological evaluation.

As appellant correctly notes, the trial court's duty to hold a hearing on a competency motion is governed by R.C. 2945.37. Section (A) of this provision specifically states that a trial court "shall" hold a competency hearing if the issue is properly raised prior to trial. In interpreting this language, the courts of this state have held that a hearing is mandatory under these circumstances. See, e.g., State v. Rubenstein (1987), 40 Ohio App.3d 57, 531 N.E.2d 732.

 Although the statute is relatively clear as to when a hearing must be held, it does not specifically state what procedure a court must follow within such a hearing. However, its provisions, and those of R.C. 2945.371, support the inference that a trial court is not always obligated to order an examination.

For example, another portion of R.C. 2945.37(A) states that either the prosecutor or defense counsel "may" present evidence as to the defendant's competency at the hearing. The next sentence of the section then states that a written report on the competency issue "may" also be presented at the hearing. The use of the

word "may" implies that the submission of the report, or any evidence on the issue, is not necessarily required at every hearing.

More important, this court would note that section (A) of R.C. 2945.371 provides, in pertinent part:

"If the issue of a defendant's competence to stand trial is raised under section 2945.37 of the Revised Code, the court *may* order one or more, but not more than three evaluations of the defendant's mental condition." (Emphasis added.)

Again, the use of the word "may" supports the conclusion that a trial court is not required to order an evaluation of the defendant's mental condition every time he raises the issue. Instead, the wording of the statute implies that the ordering of an examination is a matter within the discretion of the trial court.

Taken as a whole, the provisions of R.C. 2945.37 and 2945.371 support the inference that when the initial hearing on a competency motion is held, the trial court is only required to give the defendant, or his counsel, the chance to submit evidence on the issue. If this evidence raises a genuine question as to the defendant's competency, the court can order that one or more evaluations be performed. If it does not, the court can find the defendant competent and proceed to trial.

As to this point, this court would emphasize that the defendant is presumed to be competent unless the opposite conclusion is supported by a preponderance of the evidence submitted at the hearing. R.C. 2945.37(A). Accordingly, at the initial hearing, the burden is upon the defendant, or his counsel, to submit enough evidence to put the question at issue.

Lastly, we would note that the very case law cited by appellant supports the foregoing analysis. In *Rubenstein, supra,* at fn. 4, the Eighth Appellate District held that the hearing requirement of R.C. 2945.37 had been satisfied when the defendant was given an opportunity to present evidence on the issue.

In this case, appellant was clearly given the chance to present evidence on the issue. In support of the motion, appellant's trial counsel stated that his client had failed to fully cooperate with him in preparing for trial. Counsel also stated that appellant did not appreciate the nature of the charges against him.

However, during the interview with appellant, the trial court specifically described the nature of the charges and possible penalties to him. In response, appellant stated that he fully understood the court's explanation. Moreover, appellant's responses to the court's questions were totally coherent. Although appellant did state at one point that he was experiencing some mental problems, there was simply no indication that these problems rendered him incapable of

assisting his counsel. Mental illness does not necessarily correlate to incompetency.

▮ In overruling the request for an examination, the trial court could also rely upon its observations of appellant while he testified at the suppression hearing. A review of this testimony indicates again that appellant's responses to the questions of counsel were coherent.[1]

Given this evidence, the record before us supports the conclusion that the trial court acted within its discretion in not ordering an evaluation of appellant's competency to stand trial. Thus, his first assignment of error is without merit.

▮ The next three assignments of error in this appeal pertain to the trial court's decision to exclude certain evidence which was offered by appellant. As was noted earlier, in addition to recanting the statements he had made in his confession, appellant also attempted at trial to attack the credibility of the written confession. To accomplish this, appellant tried to introduce testimony concerning his background and the circumstances surrounding his interrogation about the incident by the detective at the station. The purpose behind this testimony was to show that the confession had resulted from undue influence. For the most part, the trial court refused to allow the proposed testimony.

For example, in cross-examining the detective, counsel for appellant attempted to elicit testimony concerning the nature of the questioning to which appellant had been subjected during the interrogation. After the state had objected, the court informed counsel that although he could elicit general information as to the interrogation, he could not go into any matter which had been covered in his motion to suppress the confession. In that pretrial motion, it had been argued that the confession was involuntary because the detective had employed improper techniques in questioning appellant.

---

1. During its discussion of the motion with counsel, the trial court stated its displeasure with the timing of the motion. Specifically, the court questioned why counsel had waited until six days before trial to request a procedure which would obviously necessitate yet another continuance. Upon reviewing the record, this court concludes that the trial court did not base its decision solely upon this fact.

Our review of the record indicates that despite the fact that the case had been pending for approximately seven months, the issue of appellant's competency had never been raised until the motion in question was filed. Yet, in his affidavit accompanying the motion, counsel for appellant stated that his client had been unable to assist in his defense since the beginning of the representation.

Clearly, the lateness of the motion cannot be the sole factor for consideration in ruling on the competency issue especially if an evaluation were, indeed, needed. A trial court is obligated to order an evaluation, if needed, so long as the motion was filed prior to trial. In other words, a trial court cannot "punish" counsel by denying the motion solely on the basis of timeliness. However, timeliness can be an issue in determining the *validity* and merits of the request.

Under his second assignment of error, appellant asserts that the trial court erred in limiting this cross-examination of the detective. He submits that this testimony was admissible because it was relevant to the issue of the credibility of his confession. In support, he cites *Crane v. Kentucky* (1986), 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636.

In *Crane*, the Kentucky Supreme Court had held that if any evidence had been used to support a pretrial finding that a confession had been given voluntarily, such evidence could not be presented to the jury at trial for any purpose. Rejecting the assumption that evidence as to the credibility of a confession and evidence as to the voluntariness of a confession were distinct, the United States Supreme Court held that a defendant would be denied his right to a fair trial if he was not allowed to introduce such evidence at trial. The court emphasized that "the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial." (Emphasis *sic.*). *Id.,* at 688, 106 S.Ct. at 2145, 90 L.Ed.2d at 643. The court also stated:

"But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be 'insufficiently corroborated or otherwise * * * unworthy of belief.'" *Id.,* at 689, 106 S.Ct. at 2146, 90 L.Ed. at 644, quoting *Lego v. Twomey* (1972), 404 U.S. 477, 485–486, 92 S.Ct. 619, 624–625, 30 L.Ed.2d 618, 625–626.

Under *Crane*, of course, the jury cannot redetermine the legal question of whether the confession is constitutionally admissible into evidence. The constitutional validity of a confession is clearly a question for the trial court.

However, under *Crane*, the jury can use the evidence concerning the voluntariness of the confession to decide whether the circumstances surrounding the confession render it unbelievable or incredible. Cf. *United States v. Bartlett* (C.A.8, 1988), 856 F.2d 1071, 1084, at fn. 18. As one Ohio court has stated, in determining the weight to give to a confession, a jury is entitled to hear evidence as to "'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Hopkins* (July 29, 1987), Hamilton App. No. C–860806, unreported, at 4, 1987 WL 14759, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 40–41, 3 O.O.3d 18, 23, 358 N.E.2d 1051, 1058–1059.

In this case, the trial court sustained objections to questions which would have elicited admissible testimony under *Crane*. For example, objections were sus-

tained as to questioning concerning whether the detective had commented upon appellant's mental health or promised to get help for appellant. An objection was also sustained in relation to a question concerning whether the detective had slammed his fists together when appellant had failed to give the response he supposedly wanted.

█ As the state aptly notes, the *Crane* court held that its analysis was subject to the harmless error rule.

Nevertheless, given the particular facts of this case, this court concludes that the limitations on the cross-examination of the detective were not harmless error. As in *Crane,* appellant's entire defense to the murder charges was predicated upon his repudiation of his confession; thus, when the trial court refused to allow testimony concerning the circumstances surrounding the confession, he was denied the opportunity to present his solitary defense. Accordingly, as the trial court should have allowed the jury to make its own determination concerning the credibility of the detective's testimony, appellant's second assignment of error is well taken.

Under his next assignment of error, appellant submits that the trial court also erred in not allowing the jury to hear all of appellant's testimony.

█ Just before appellant took the stand, the state moved for a determination that appellant's counsel not be allowed to ask him questions concerning the interrogation. At first, consistent with its earlier decision as to the detective, the trial court held that appellant would not be permitted to answer such questions. Near the end of the sidebar, though, the court *appeared* to change its decision:

" * * * What [counsel] is saying [is that appellant] can recant it, he can tell why he is recanting it and the reason that he gave it in the first place. The suppression is merely trying to keep it out of evidence. The jury can determine the value of it thereafter. * * * You can explain the circumstances surrounding the confession, why he is recanting it and if there is something in the nature of rebuttal from [the detective], he is there."

Consistent with this correct statement of the law, the trial court allowed appellant to answer many questions pertaining to the confession. For example, appellant was permitted to testify that he felt that he had eventually just given up and said what he thought the detective wanted to hear.

However, a review of appellant's testimony shows that the court sustained many objections to questions concerning the ultimate issue of the reliability of his confession. For example, appellant was not allowed to answer *why* he had confessed, or what effect the questioning had had on him. As this court

interprets *Crane*, the trial court erred in not permitting appellant to answer to the extent allowed by *Crane*.

As a technical matter, this court would agree that the trial court gave appellant's trial counsel more leeway in his direct examination of appellant than in the cross-examination of the detective. Moreover, we would note that, as the foregoing examples demonstrate, there was considerable overlap between the questions which were sustained and those that were allowed.

Nevertheless, we feel constrained to conclude that the trial court did not permit appellant to fully explore the areas which *Crane* permits. The credibility of the confession was the keystone of the prosecution's case. Thus, this aspect of the third assignment has merit.

■ Besides the testimony concerning the confession itself, counsel for appellant also attempted to elicit testimony from his client as to his relationship with his adoptive father. Again, prior to the testimony, counsel stated to the court that he sought to establish through this proposed testimony that appellant had been sexually abused by his adoptive father, and this had caused him to develop a male-dominated personality particularly susceptible to the type of tactics imputed to the detective. In the second part of appellant's third assignment, he asserts that the trial court erred in excluding this testimony.

In regard to this particular issue, the record shows that the court allowed appellant to answer the majority of the questions concerning his relationship with his adoptive father. However, the court refused to allow appellant to respond to questioning pertaining to the *effect* this abuse had on his psychological development and susceptibility.

As to this particular line of questions, we conclude that the trial court correctly excluded appellant's proposed testimony on the psychological repercussions of his abuse. Clearly, only an expert in psychology would be qualified to testify concerning whether the alleged sexual abuse had caused appellant to become submissive in response to the detective. Obviously, appellant did not qualify as such an expert; thus, his own opinion on the subject was incompetent. Further, without an expert's foundation opinion to set the stage, there was no basis established on the subject of abuse, thus, it was properly excluded. As a result, the second argument under appellant's third assignment of error is without merit.

In relation to the alleged sexual abuse, counsel also attempted to elicit similar testimony from appellant's grandmother. At the beginning of her testimony, the trial court stated to counsel that he would not be allowed to question her on appellant's relationship with his adoptive father. Thus, counsel did not even attempt to question her on this point.

Again, in conjunction with the grandmother's proposed testimony, counsel for appellant never attempted to present any expert testimony concerning the possible effect of the alleged abuse. As a result, consistent with our holding in the third assignment, this court holds that the trial court correctly excluded all of the grandmother's testimony on this subject as its relevancy was never established. Accordingly, appellant's fourth assignment fails.

At the close of the trial, appellant moved the trial court to instruct the jury on the offenses of murder and involuntary manslaughter, as lesser included offenses of aggravated murder. In denying this motion, the court stated that the state had been successful in demonstrating that the murder had been committed with prior calculation and design. Under his next assignment of error, appellant claims the court erred in denying his motion.

The Ohio Supreme Court has delineated a three-prong test for determining whether an offense is a lesser included offense of another offense. *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus. Consistent with this test, the Supreme Court has also held that the offense of murder can be a lesser included offense of aggravated murder. *State v. Rohdes* (1986), 23 Ohio St.3d 225, 23 OBR 382, 492 N.E.2d 430. See, generally, *State v. Soke* (Mar. 6, 1992), Lake App. No. 90–L–14–061, unreported, 1992 WL 190170.

■ Even when an offense is a lesser included offense of another, a trial court is only required to instruct the jury on the lesser *included offense if the evidence warrants the charge.* In *State v. Thomas* (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286, 289, the Supreme Court stated the test in the following manner:

" * * * even though an offense may be statutorily defined as a lesser included offense of another, a charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."

■ Appellant was indicted under R.C. 2903.01(A), which defines aggravated murder as purposely causing the death of another with prior calculation and design. As the offense of murder is defined simply as purposely causing the death of another, the sole distinction between these offenses is the element of prior calculation and design. Upon reviewing the trial transcript, this court agrees with the trial court that the evidence supported a finding in favor of the state on this element.

Specifically, the testimony of two witnesses showed that on two separate occasions, appellant discussed the possibility of hiring someone to kill his parents. First, appellant asked a woman whether her husband would consider "blowing up" his parents with dynamite. Second, appellant asked another individual if he knew of anyone who could kill his parents. Moreover, there was some testimony

indicating that on a third occasion, appellant told a third person that he would be better off financially if something happened to his parents.

More importantly, this court would emphasize that in his confession, appellant stated that he stared at the gun for a period of time after loading it. He also stated that he looked at his parents for a short period before shooting.

■ In interpreting the requirement of prior calculation and design, the Supreme Court has held that an instantaneous deliberation does not satisfy the element. *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph two of the syllabus. However, a prolonged thought process is also not required. In *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, the court upheld a conviction for aggravated murder when the evidence showed that the defendant only had "instants" to design the death of the victim. See, also, *State v. Leftwich* (Dec. 15, 1987), Franklin App. No. 87AP–239, unreported, 1987 WL 28456.

In this case, if appellant's written confession was found to be credible, his periods of contemplation were sufficient to satisfy the element of prior calculation and design. Moreover, we would note that there was no evidence presented which supported any alternative theory which both acknowledged the killing and refuted the element of prior calculation and design. Thus, the evidence in the record did not support an acquittal on the two counts of aggravated murder, while supporting a conviction for murder.

■ As indicated earlier, appellant also argues under this assignment that the trial court should have instructed the jury on the offense of involuntary manslaughter. Defined in R.C. 2903.04, this offense prohibits a person from causing the death of another as a result of committing or attempting to commit a felony or misdemeanor.[2]

Like the offense of murder, involuntary manslaughter is considered a lesser included offense of aggravated murder. *Thomas, supra,* paragraph one of the syllabus. Comparing the elements of aggravated murder, murder, and involun-

---

2. As the wording of the statute implies, R.C. 2903.04 typically applies in the situation where the accused causes the death of a person *while committing a separate felony or misdemeanor.* Here, that is not the situation, as appellant was only indicted on two counts of aggravated murder.

However, in applying the *Deem* standard for determining whether one crime is a lesser included offense of another, the *Thomas* court stated at 216, 533 N.E.2d at 289 that " * * * one cannot criminally cause another's death without committing an underlying felony or misdemeanor * * *." *Thomas* is puzzling because the defendant was only charged with aggravated murder; no underlying felony or misdemeanor was alleged or charged. Accordingly, we conclude that if the facts had supported it, the jury could have been instructed on the offense of involuntary manslaughter.

tary manslaughter, the *Thomas* court stated that the element of purposefulness constitutes the sole distinction between these three crimes. *Id.,* 40 Ohio St.3d at 217, 533 N.E.2d at 290. Accordingly, an instruction on the offense of involuntary manslaughter is warranted only when the evidence supports the conclusion that the accused specifically intended to cause a particular result. See R.C. 2901.-22(A).

In relation to the issue of intent, the Supreme Court has also held:

" * * * where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill." (Citations omitted.) *State v. Jester* (1987), 32 Ohio St.3d 147, 152, 512 N.E.2d 962, 968.

In applying *Jester,* this court has held that when the defendant stabbed and slashed his victim over fifty times with a knife, it could be presumed that he had intended to cause the victim's death. *Soke, supra.* Based upon this analysis, this court held that the trial court had properly refused to instruct the jury on the offense of involuntary manslaughter.

Given that the victims in this case were shot a number of times, the *Soke* analysis is readily applicable to the instant facts. Nevertheless, appellant contends that an instruction was warranted because he stated in his written statement that he was "out of control," and that he felt as if someone else had control of his body. He also emphasizes the fact that not all of the shots were fired directly at the victims.

By citing the statements in his confession, appellant argues that the jury could have concluded that at the time of the incident, he had been experiencing a psychological problem which stopped him from forming the requisite intent. Thus, in essence, appellant has attempted, in an indirect manner, to raise a variation of the defense of diminished capacity. Such a defense is not recognized in this state. *State v. Wilcox* (1982), 70 Ohio St.2d 182, 24 O.O.3d 284, 436 N.E.2d 523. Unless he can establish that he was insane at the time of the crime, a defendant cannot argue that he did not form the requisite *mens rea* for aggravated murder because his ability to think had been impaired. See *State v. Poling* (May 17, 1991), Trumbull App. No. 88–T–4112, unreported, 1991 WL 84229.

Since the evidence in this case supports the trial court's decision not to instruct on the lesser offenses of murder and involuntary manslaughter, appellant's fifth assignment of error is without merit.

■ In his next assignment of error, appellant maintains that the court erred in concluding in the suppression hearing that he had properly waived his rights prior to giving his written statement.

Under the seminal case of *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, a police officer cannot conduct a custodial interrogation unless the accused has first properly waived his Fifth Amendment rights. The *Miranda* court also stated that a waiver will only be found to be valid when it was made knowingly, intelligently and voluntarily.

In the years since *Miranda,* courts have attempted to further define each prong of the foregoing test. For example, the Ohio Supreme Court has recently defined the voluntary prong of the test:

"A suspect's decision to waive his Fifth Amendment privilege against compulsory self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Dailey* (1990), 53 Ohio St.3d 88, 559 N.E.2d 459, paragraph two of the syllabus, citing *Colorado v. Spring* (1987), 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 966.

Moreover, in generally deciding whether a waiver was valid, courts have held that the totality of the circumstances must be considered in applying the foregoing test. See *Moran v. Burbine* (1986), 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410.

A review of the record shows that appellant was given the *Miranda* warnings twice on the day that he gave his written statement: once at the home, and once at the start of the questioning at the station. In each instance, appellant replied that he had understood what his rights were. In addition, just prior to writing his statement, appellant was required to read a paragraph which again set forth his rights. Upon reading the paragraph, appellant placed his initials beside it, thereby indicating that he had understood the rights. Appellant also indicated that he was able to read and write English, and had finished twelve years of school.

In arguing that a valid waiver was not given, appellant emphasizes that the evidence did not support the conclusion that the detective told him that he had the right to stop at any time and request an attorney. However, as the state notes, the record shows that the first officer informed him of this right. In addition, the statement which appellant read prior to writing his statement also indicated that he had a right to the presence of an attorney during questioning.

In addition, appellant again raises the issue of whether coercion was used to make him give the statement. As to this point, this court would note that at the suppression hearing, the detective denied the majority of the allegations which

appellant made. Thus, the trial court's ultimate judgment on this issue was predicated upon its determination of the credibility of the witnesses. The record does not support the conclusion that the trial court abused its discretion in accepting the detective's testimony over that of the appellant.

Taken as a whole, the evidence presented at the suppression hearing does not support the conclusion that appellant's will was overborne, or that he did not understand the meaning of waiving his rights. Thus, as the trial court did not err in denying the motion to suppress the confession, appellant's sixth assignment of error is not well taken.

Under his seventh assignment of error, appellant challenges the admission of certain items into evidence. Appellant argues that these items should not have been allowed into evidence because the state failed to provide proper discovery of them. The items to which he refers include (1) the .38 caliber Smith and Wesson revolver; (2) certain aspects of the testimony of the detective who took appellant's written statement; and (3) the testimony of a witness who was not discovered by the state until after the trial had started.

In relation to the third item, appellant *appears* to question whether the witness at issue, Mark Brooks, had, indeed, just been discovered by the state. Without stating a specific allegation, appellant hints at some type of "clandestine" agreement between the prosecutor and Brooks.

A review of the record indicates that a second witness, John Cross, referred the state to Brooks. Prior to Brooks's testimony at trial, the trial court conducted a voir dire examination of Cross. During the examination, Cross stated that although he had information relevant to the incident, he had not come forward because he thought his testimony would not be needed. However, upon giving this information to an off-duty policeman during a casual conversation after the trial had begun, Cross was contacted by the prosecutor. Based upon this testimony, the trial court concluded that the testimony of both Cross and Brooks would be allowed because there was no indication that the state had been conducting a continuing investigation.

Upon reviewing the transcript, this court agrees that Cross's testimony supports the conclusion that not only was there no foul play on the part of the state, but the proposed evidence had been newly discovered. Moreover, we would note that since Brooks's testimony only pertained to statements appellant had made about wanting to kill his parents, this evidence was not critical to the state's case regarding prior calculation and design. (See the discussion under the fifth assignment of error.) As a result, we conclude that Brooks's testimony was properly admitted.

As to the other two items to which appellant refers, the record before us indicates that the state failed to include these items in responding to appellant's discovery request. Nevertheless, since these items were not critical components of the state's case, this court fails to see how appellant was prejudiced by the admission of the evidence. Specifically, appellant has failed to demonstrate how prior knowledge of these items would have changed the basis of his defense. See *State v. Parsons* (1983), 6 Ohio St.3d 442, 6 OBR 485, 453 N.E.2d 689.

In regard to the Smith and Wesson revolver, the record indicates that this item was only presented to corroborate appellant's oral statement and to distinguish it from the Charter Arms revolver. (See the discussion under appellant's eighth assignment of error). In addition, the detective's statements merely pertained to where the gun was loaded, which victim was shot first, and the purpose of the note to appellant's mother. As to where the gun was loaded, this court would note that this statement was also in appellant's written confession. Accordingly, since the nondisclosure of these items did not prejudice appellant, this assignment of error is not well taken.

The eighth assignment of error in this appeal sets forth two separate arguments. Under the first, appellant contends that the trial court erred in not dismissing one of the two indictments prior to trial. He maintains that as a result of the two indictments, his trial counsel was unable to conduct proper discovery.

In relation to this issue, this court would note that the two indictments were identical, except that the second contained two firearm specifications. Second, we would note that the second indictment was returned approximately three months before trial; thus, even if counsel had conducted discovery under the first indictment, he still had ample time to discover any "new" evidence, whatever it may have been. Finally, a review of the record shows that the trial court informed counsel prior to trial that the case would be proceeding under the second indictment. Thus, taken as a whole, the record does not support appellant's assertion that he was denied a full opportunity to defend himself in this case.

In the second part of this assignment of error, appellant again contends that the trial court erred in allowing the state to introduce the .38 caliber Smith and Wesson revolver into evidence. This time, he maintains that the gun should have been excluded because it was extraneous to the case.

As was noted earlier, the Smith and Wesson revolver was the only firearm which was found at the Erbeznik residence. An inspection of this gun at the time showed that it had not been fired recently. Plus, an analysis of the rifling on the

bullets found in the bedroom indicated that the bullets had been fired from a Charter Arms revolver. Accordingly, the state's evidence unequivocally showed that the Smith and Wesson revolver was not the murder weapon.

Nevertheless, our review of the trial transcript shows that the Smith and Wesson revolver was relevant to certain factual issues. As part of his testimony, the detective who had interrogated appellant at the station gave a synopsis of the oral statement appellant gave before completing the written statement. According to the detective, appellant admitted in the oral statement that he had placed *two* guns into the crawl space in his room, and had then used the smaller gun in committing the crimes.

Clearly, the fact that the officers actually found the Smith and Wesson in the crawl space corroborated appellant's oral statement to the detective, thereby bolstering its credibility. As the introduction of the gun into evidence at trial served the same purpose, it was relevant.

Moreover, in our opinion, the probative value of the gun outweighed its possible prejudicial effect. Unlike items such as photographs of murder victims, the gun itself was not sufficiently gruesome to warrant its exclusion under Evid.R. 403.

Appellant emphasizes that the introduction of the Smith and Wesson may have confused the jury. However, as we noted earlier, the record simply does not support this assertion. Our review of the record indicates that the testimony of the state's witnesses unequivocally established that the Smith and Wesson revolver was not the murder weapon. The jury could not have been confused as to the limited "role" the Smith and Wesson played in this incident.

Accordingly, as we conclude that the trial court did not abuse its discretion in allowing the introduction of the gun into evidence, the eighth assignment of error is without merit.

Appellant's ninth assignment of error also raises two distinct arguments for this court's consideration. Under his first argument, appellant maintains that the trial court erred in failing to admonish the jury to disregard comments as to whether he was guilty.

The comment in question was made by a prospective juror during voir dire examination. While being questioned by the court, the juror indicated that at some point subsequent to the shootings, her daughter had spoken to appellant. Then, upon being asked whether she had formed an opinion as to appellant's guilt or innocence, the juror stated that she thought he was guilty. The juror was then dismissed.

Following this incident, the trial court did not tell the other jurors to disregard the comment. While this court would agree that such a statement to the jury

would have been appropriate, a review of the record shows that during the entire voir dire process, the court continually reminded the jury that they had to set aside any preconceived notions they might have, and decide the case solely on the evidence presented. Moreover, the record shows that appellant never requested such an instruction. Given these circumstances, appellant has failed to show that he was prejudiced.

In the next part of this assignment of error, appellant asserts that the trial court erred in excusing a juror during the trial without informing his counsel first. Again, although this court may agree that the better practice may have been to inform counsel of the fact that the juror sought to be excused because he had just received his military orders, no prejudice has been shown. Moreover, we would note that counsel for appellant did not object to the procedure used in dismissing the juror until the following day. Thus, this assignment does not set forth a basis for reversing the trial court's judgment.

In his tenth assignment of error, appellant maintains that the trial court erred in imposing additional incarceration under the firearm specification. Specifically, he argues that the specification should have been dismissed because the state failed to establish beyond a reasonable doubt that the gun in question was operable. In support, appellant cites the fact that the murder weapon was never found.

Under R.C. 2929.71(A), the trial court must impose an additional term of three years to a sentence if a defendant is convicted of any felony, other than a violation of R.C. 2923.12, and had possession of a "firearm" while committing the offense. The term "firearm" is then defined in R.C. 2923.11(B) as any deadly weapon capable of propelling or expelling a projectile.

In interpreting R.C. 2923.11(B), the Supreme Court has expressly held that the state's burden as to operability can be met through circumstantial evidence:

"Admission into evidence of the firearm allegedly employed in the crime is not necessary to establish the specification. Rather, the fact may be established by circumstantial evidence (testimony as to gunshots, smell of gunpowder, bullets or bullet holes, etc.). Nevertheless, there must be some evidence relative to the gun's operability." *State v. Gaines* (1989), 46 Ohio St.3d 65, 69, 545 N.E.2d 68, 71–72.

In *Gaines*, the only evidence presented by the state in relation to the operability issue consisted of testimony concerning the appearance of the gun and the subjective belief of certain witnesses that the gun was operable. The Supreme Court concluded that this evidence was insufficient to establish operability of the gun.

As appellant correctly notes, the *Gaines* decision was subsequently modified in *State v. Murphy* (1990), 49 Ohio St.3d 206, 551 N.E.2d 932. There, the court held

that operability could be "established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." *Id.* at 209, 551 N.E.2d at 935. Applying the *Murphy* holding to the instant case, appellant asserts that since the murder weapon was never found and there were no witnesses to the slayings, the state failed to sustain its burden as to operability.

Apparently, appellant believes that as a result of the *Murphy* decision, operability can no longer be established through circumstantial evidence, such as bullets and bullet holes. However, this court interprets *Murphy* to only modify that aspect of *Gaines* which pertained to the observations of lay witnesses. In our opinion, the statement in *Gaines* as to the use of circumstantial evidence, quoted above, has not been modified. Cf. *State v. Hicks* (Apr. 19, 1990), Montgomery App. No. 11567, unreported, 1990 WL 51500 (conviction on firearm specification upheld because of the presence of two bullet wounds).

In the instant cases, the evidence readily demonstrated that bullets were found in the victims and the wall of the bedroom. Under *Gaines,* this evidence was sufficient to support a finding of operability. We accordingly conclude that appellant's tenth assignment of error is not well taken.

██ Under his final assignment of error, appellant submits that even if all of the foregoing assigned errors are found by this court to be harmless, the cumulative effect of these errors warrants the reversal of his conviction. Specifically, he maintains that as a result of this cumulative effect, he was denied a fair trial. In raising this argument, appellant has not set forth any new issue for review by this court.

In interpreting App.R. 12(A), the courts of this state have held that assignments which fail to specify an exact legal error will be disregarded by an appellate court. See, *e.g., State v. Myles* (Jan. 17, 1989), Stark App. No. CA-7563, unreported, 1989 WL 4752; *State v. Wernert* (Oct. 19, 1984), Lucas App. No. L-84-166, unreported, 1984 WL 14306. An assignment which states that the cumulative effect of other errors is itself grounds to reverse does not satisfy this requirement. Thus, the final assignment of error in this appeal is likewise without merit.

For the reasons set forth under our discussion of the second and third assignments of error, the judgment of the trial court is reversed, and the cause is hereby remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

JOSEPH E. MAHONEY and EDWARD J. MAHONEY, JJ., concur.

EDWARD J. MAHONEY, J., retired, of the Ninth Appellate District, sitting by assignment.